THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
METROPCS NEW YORK, LLC,

                                    Plaintiff,

                                                        **ORDER**
            -against-                                   09-CV-4636 (SJF)(AKT)

VILLAGE OF EAST HILLS, VILLAGE OF
EAST HILLS ZONING BOARD OF
APPEALS, and VILLAGE OF EAST HILLS
VILLAGE CLERK,

                                    Defendants.
--------------------------------------------------------X
FEUERSTEIN, J.


I.      Introduction


        On October 28, 2008 plaintiff MetroPCS New York, LLC ("plaintiff" or "Metro") filed a

complaint against the Village of East Hills (the "Village"), the Village Zoning Board of Appeals, and

the Village Clerk (collectively the "defendants") pursuant to the Telecommunications Act of 1996

(the "TCA"), specifically 42 U.S.C. § 332(c)(7)(B), and Article 78 of the New York Civil Procedure

Law and Rules. Plaintiff seeks a declaratory judgment that the ZBA's denial of plaintiff's

application for a special exemption permit and two (2) variances violated the TCA, and requesting

that the Court vacate the denial and grant an injunction compelling the defendants to grant the

application.

## II.    Background

Metro submitted a Rule 56.1 statement and accompanying attorney declaration consistent with Local Rule 56.1.  The Village's failed to include an opposing Rule 56.1 statement.  Therefore, insofar as the facts are undisputed, the Court relies upon Metro's 56.1 statement, attorney declaration, and the record directly.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).

### A.    Metro's Application

Metro holds a license from the Federal Communications Commission (the "FCC") to provide "wireless communications services" to customers, and provides telephone service to their customer's mobile telephones through a network of fixed base cell sites.  Declaration in Support of Plaintiff's Motion for Summary Judgment ("Decl.") ¶¶ 10,12-14.  Metro attempts to provide "seamless and reliable coverage" by strategically placing cell cites throughout its licensed coverage area at locations where it identifies a significant coverage gap, which it defines as an area which does not "adequately [permit a customer to] transmit or receive calls, maintain a call and access the national telecommunication network for personal, business, 911 emergencies and public safety communication." *Id.* ¶¶ 16-19.  Metro's "radio frequency expert" has concluded that there is a significant coverage gap in the Village and the surrounding area. *Id.* ¶¶ 17-20.

Metro's engineers investigated the coverage gap area seeking sites for potential towers or "usable antenna support structures" to remedy the coverage gap. *Id.* ¶¶ 25, 22-26. The only site that met Metro's criteria for "location, height wireless antenna clearance, network coverage and equipment space" where the owner was willing to enter a lease agreement and agree to the terms of the lease with Metro, was a three-story commercial building in the Village at 70 Glen Cove Road (the "Building"). *Id.* ¶¶ 26, 28-29. Two (2) other wireless communication service providers had previously installed a total of twelve (12) antennas on nine (9) "pipe mounts" which were attached to bulkheads on the roof of the building. *Id.* ¶¶ 30, 38-40.

Metro applied to the Village for a permit to attach six (6) antennas on three (3) additional pipe mounts to the existing bulkheads,[1] and intended to place other related equipment inside the building ("the application").[2] *Id.* ¶¶ 32-33, 37. Although Metro contends that the heights of the proposed antennas were "similar to the heights of the antennas associated with the [other carriers' antennas]," Compl. ¶ 64, according to the Village's Building Department Superintendent, the proposed the antennas would exceed the height maximums of the Village Zoning Code, and Metro must obtain "(I) an SEP [special exemption permit] and/or use variance for the proposed use . . . (ii) a height variance . . . and (iii) an SEP for the accessory structure."

---

[1]The antennas are described: "Each sector of two antennas will be vertically mounted to a single pipe support structure affixed to the bulkhead, with the antennas stacked one atop the other." Decl. ¶ 34. As there are two existing bulkheads, one sector will be attached to one and the other two sectors will be attached to another. *Id.*

[2]At the time of the initial application, Metro proposed building a structure on the roof to contain the related equipment; however, during the application process Metro amended the application such that the equipment would be stored inside the Building, and only the antennas would be placed upon the roof. Within this Order, the application and the proposed modifications refer to the application as amended: the application ultimately decided upon by the ZBA.

Compl. ¶ 69, Plaintiff's Attached Administrative Record ("Record") at 369.

On February 9, 2009, Metro filed an application with the Village Zoning Board of Appeals (the "ZBA") seeking the required variances and a special exemption permit. Decl. ¶ 44. The application was denied on September 28, 2009 following hearings at which approximately sixty (60) exhibits were submitted to the board by Metro and the Village residents, six (6) witnesses were called by Metro, and one (1) witness was called by the ZBA,. *Id.* ¶ 94-95.

B.     The ZBA Hearings

The ZBA held hearings on Metro's application in 2009 on February 26, March 17, April 21, May 19, June 30 and July 28. *Id.* ¶ 44. The ZBA heard testimony and accepted affidavits from Metro's witnesses. *See id.* ¶¶ 45-77. The topics covered were Metro's FCC license, the location and meaning of the "significant coverage gap", the details of the investigation of proposed sites and why the Building was the only viable site where the antennas would fill the coverage gap, the aesthetic impact of the additional antennas, and the health and safety of the tenants and emergency workers. *Id.* Metro submitted an appraisal report stating that real estate values would not decrease as a result of the antennas, however the author of the report "did not testify because no questions were asked regarding real estate values." *Id.* ¶ 46(d).

Sixteen (16) community residents testified in opposition to the application. *Id.* ¶¶ 86-92. The ZBA accepted into the record approximately nineteen (19) documents from community members including several internet articles and letters purporting to describe a correlation between cell antennas and cancer patterns, petitions against the antenna from Village residents

and Building tenants, and a hand drawn map purporting to depict where certain residents diagnosed with cancer live nearby the Building. *Id.* ¶ 92.

The Village retained Richard Comi at the request of the ZBA to evaluate the application because the ZBA "is not familiar with these applications" and because "a lot of the presentation was technical jargon." *Id.* ¶ 81. Mr. Comi testified on May 19, 2009, that Metro had not provided "any of the technical information necessary to conclude whether there is a gap in service and, if there is, how large that gap in service is." Plaintiff's Attached Administrative Record ("Record") at 236. Mr. Comi testified with respect to the radio emissions from the antennas that although he does not know what the emissions are, in his opinion "the information in [Metro's] report . . . is incomplete and inaccurate." *Id.* at 239. Mr. Comi also testified that the proposed antennas were not "state of the art" in two (2) respects: (1) they do not contain stealth screen technology which has been used elsewhere and renders the antennas "essentially invisible"; and (2) there is an alternative technology called "distributed antenna service" ("DAS") that Metro could employ which would only require additional smaller antennas placed on traffic lights throughout the Village. *Id.* at 240-42.

On June 30, 2009, Metro cross-examined Mr. Comi and established that Mr. Comi was not a licenced architect, engineer or a certified appraiser or planner and had not tested Metro's signal in the Village. *Id.* at 305-06, 311-12, 315. Metro submitted: a letter from counsel Gregory Alvarez stating that DAS technology would require approximately seven (7) antennas placed in front of residences or attached to newly constructed poles to duplicate the proposed antennas at the Building; a letter from an architect stating that the roof of the Building could not structurally support the screening suggested by Mr. Comi; and an affidavit and report by a radio frequency

engineer stating there is a need for a site in the area and that the Building is "ideally located" *Id.* at 315-17, 610-63.

On July 28, 2009, Mr. Comi had an opportunity to respond to Metro's cross-examination and rebuttal submissions. *Id.* at 322-31. He challenged: Mr. Alvarez's letter by stating that he did not agree that DAS technology would be more intrusive or would require seven antennas, *Id.* at 322-23; the architect's letter by stating that he had been involved with "literally hundreds of facade or roof-mounted utilities on all types of buildings, and screening material has never been of such a weight and duration that the building either couldn't stand as it exists or be modified", *Id.* at 324; and the report of the radio frequency engineer as incomplete and unsubstantiated. *Id.* at 325-31.

At the July 28th hearing, Metro called several "experts" to rebut Mr. Comi's testimony. *Id.* at 334-367. Neil McDonald, a licensed architect testified that the roof could not bear the weight of the stealth screens because "the wind load acting on these large, tall flat panels" would place "a tremendous amount of horizontal thrust on the building components." *Id.* at 335. Accommodation of the stealth screens would require "ripping off the roof to replace structural members and tearing down an entire floor" that is currently occupied by tenants. *Id.* at 337. Metro's radio frequency engineer testified that the company performed "drive tests" and a "continuous wave test" in the village and determined that there was a "significant [coverage] gap." *Id.* at 344-47. Metro also called Dave Collins who calculated that everywhere on the roof, the "uncontrolled exposure level" of radio frequency emissions was below approximately sixteen percent (16%) of the limit set forth by the FCC, and that therefore, no one on the roof would be exposed to radio emissions higher than the FCC limits. *Id.* at 354-57.

6

C.      The ZBA Decision

The ZBA denied Metro's application on September 28, 2009 (the "Decision"), Record 1-19; Decl. ¶ 94, on several grounds including that:

(1) the "existing negative aesthetic impact of the Building upon surrounding Village neighborhoods should not be exacerbated" and that approval of Metro's application would "worsen a continuing adverse effect and/or negative impact in neighborhood aesthetic conditions," Decision ¶ 31;

(2) it was "obvious" to the ZBA that "an unsightly commercial building, the largest in the Village, in close proximity to residential homes will have a negative impact upon the marketability and prices of such homes," *Id.* ¶ 32;

(3) Metro had not demonstrated a need for the antennas because "evidence about a gap is contradictory, depending upon whether MetroPCS's hearing consultants or marketing to the public representations are credited." *Id.* ¶ 30. Furthermore, the ZBA stated, even in the gap, "cell phone calls can be made, received and maintained" because "not one fact witness described having any real difficulty being experienced in service." *Id.* Finally, there was no need because "there are at least two other cell phone providers with installations on the building," *Id*;

(4) the ZBA found the relief requested to be "substantial" as the Building's height already exceeds the height that the building code permits; and

(5) the Decision stated that the benefit to the applicant was "outweighed by detriment posed to the Village community's health, safety and welfare."

Plaintiff has challenged the decision on the ground that: (1) it violates the restrictions on

7

community zoning of wireless communications services as codified in the Telecommunications Act; and (2) the ZBA had granted the same variances to Nextel Communications ("Nextel"), a competing wireless provider, in an application to place twelve (12) antennas on twelve (12) pipe mounts at the same location in 2001, which Nextel did not build. Decl. ¶ 41. This is not disputed by the ZBA. *See* Decision ¶¶ 5-7. Plaintiff argues that the ZBA violated the Telecommunications Act and discriminated against it by granting the variance to Nextel and not to Metro.

III.    Legal Standards

A.    Summary Judgment

Summary judgment should not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (citations and quotation marks omitted). "A fact is material when it might affect the outcome of the suit under governing law." Id. An issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. See Koch v. Town of Brattleboro, VT, 287 F.3d 162, 165 (2d Cir. 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"In order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required under Rule 56(e) to set forth specific facts showing that there is a genuine issue of material fact to be tried. If the nonmoving party does not so respond, summary judgment will be entered against him." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (citations omitted). The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." Id. at 532-33 (quotations and citations omitted).

B.    Standard of Review of the ZBA Decision & The Telecommunications Act

In New York State, "cellular telephone companies are afforded the status of public utilities . . . [and therefore] a local zoning board must consider whether the public utility has shown 'a need for its facilities' and whether the needs of the broader public would be served by granting the variance." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490 (2d Cir. 1999) (citing Cellular Telephone Co. v. Rosenberg, 82 N.Y.2d 364, 371, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993); Consolidated Edison Co. v. Hoffman, 43 N.Y.2d 598, 608-10, 403 N.Y.S.2d

9

193, 374 N.E.2d 105 (1978)).  The Telecommunications Act of 1996 ("TCA"), *codified at* 47 U.S.C. § 151, *et seq.*, further limits a local government's authority to deny application for construction of wireless telecommunications facilities.  *See* 47 U.S.C. § 332(c)(7); see also Omnipoint Comme'ns, Inc. v. City of White Plains, 430 F.3d 529 (2d Cir. 2005); Town of Oyster Bay, 166 F.3d 490; Sprint Spectrum L.P. v. Willoth, 176 F.3d 630 (2d Cir. 1999).  The Second Circuit has recognized that the TCA "strikes a balance between 'two competing aims - to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.' " City of White Plains, 430 F.3d at 531(quoting Town of Amherst, N.H. v. Omnipoint Communications, Inc., 173 F.3d 9, 13 (1st Cir.1999)).

Although a local government retains the authority to make "decisions regarding the placement, construction, and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A) , it "(I) shall not unreasonably discriminate among providers of functionally equivalent services; and (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i).  A wireless communications provider will establish that a denial violates of section 332(c)(7)(B)(i)(II) if it shows that a "significant gap" exists in wireless coverage and that its proposed facility is "the least intrusive means" to close that gap.  Willoth, 176 F.3d at 643; but cf. New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97 (2d Cir. 2010) (the TCA preempts a town statute setting forth a preference for installation of "microcell" or DAS technologies).

A denial of a wireless communications company's application to "place, construct, or modify personal wireless service facilities" must be "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The "substantial

evidence" standard of review "is deferential, and [the Court] may neither engage in []

fact-finding nor supplant the [local government's] reasonable determinations." <u>Town of Oyster</u>

<u>Bay</u>, 176 F.3d at 494. However, "the record should be viewed in its entirety, including evidence

opposed to the [local government's] view." <u>Id.</u> (citing <u>American Textile Mfr. Inst., Inc. v.</u>

<u>Donovan</u>, 452 U.S. 490, 523, 101 S. Ct. 2478, 69 L. Ed.2d 185 (1981)).

The TCA further prohibits a local government from denying a request based upon "the

environmental effects of radio frequency emissions" of the facilities insofar as they "comply with

the Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv).

Articulating concerns about the health consequences of proposed facilities is permitted, however

"when the testimony is almost exclusively directed to health effects, there must be substantial

evidence of some legitimate reason for rejecting the applications to avoid the conclusion that the

denials were based on the impermissible health effects ground." <u>Town of Oyster Bay</u>, 166 F.3d

at 495. Substantial evidence means "less than a preponderance, but more than a scintilla of

evidence." *Id.* at 494.

Article 78 of the New York Civil Procedure Law and Rules, requires that local decisions

be supported by substantial evidence. The Article 78 test "is essentially the same as that under

the TCA." <u>See</u> <u>Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill</u>, 202

F.Supp.2d 210, 226 (S.D.N.Y. 2002) (citing <u>Willoth</u>, 176 F.3d at 646). In New York, substantial

evidence is "proof within the whole record of such quality and quantity as to generate conviction

in and persuade a fair and detached fact finder that, from that proof as a premise, a conclusion or

ultimate fact may be extracted reasonably probatively and logically." <u>300 Gramatan Ave. Assoc.</u>

<u>v. State Div. of Human Rights</u>, 45 N.Y.2d 176, 408 N.Y.S.2d 54, 379 N.E.2d 1183, 1186 (1978).

Although a zoning board's authority to deny the construction of wireless facilities is limited, "aesthetics can be a valid ground for local zoning decisions." Town of Oyster Bay, 166 F.3d at 495 (citing Suffolk Outdoor Advertising Co. v. Hulse, 43 N.Y.2d 483, 490, 402 N.Y.S.2d 368, 373 N.E.2d 263 (1977)); see also City of White Plains, 430 F.3d at 533-34. However, pursuant to the limitations in the TCA, a zoning board's denial of an application for aesthetic reasons will be upheld "only if [the Court] conclude[s] that there was more that a mere scintilla of evidence before the Board on the negative visual impact of the cell sites." Town of Oyster Bay, 166 F.3d at 495 (internal citations omitted).

IV.    Analysis

The issue is whether the ZBA's denial of Metro's application for a variance in order to construct six (6) antennas on three (3) pole mounts is supported by substantial evidence in the administrative record.

A.    Aesthetic Impact

The ZBA concluded that the Building was the "tallest in the Village" and has a "prominent presence and visibility in the Village." Decision ¶ 5. The ZBA rejected Metro's evidence purporting to demonstrate that the additional antennas would be a de minimus aesthetic addition to the tower and accepted photographs of the Building presented by member of the public, describing  the Building as "an unsightly condition." Id. ¶ 12.  The Decision cited public

objections that "the proposed Communications Facility and existing rooftop installations [are] at odds with the Village's character and aesthetic qualities," and that the building is an "existing 'eyesore.'" *Id.* ¶¶ 17-18. Based upon these findings, the ZBA determined that the Building is "completely out of character withe the Village" and "existing negative aesthetic impact of the Building upon surrounding Village neighborhoods should not be exacerbated ." *Id.* ¶ 13. The ZBA refused to "worsen a continuing adverse effect and/or negative impact in neighborhood aesthetic conditions." *Id.*

In support of the argument that the added antennas are a de minimus addition and have little aesthetic impact, Metro submitted a report by and testimony from Donna Marie Stipo, a member of the American Planning Association and holder of a "New York Real Estate Sales License" issued by New York University. Record at 71, 422. Ms. Stipo concluded that the "addition of three (3) visually similar antenna mountings would not alter the existing view shed or dramatically alter the visual conditions from within the surrounding area," *Id.* at 431, and provided several photographs of the existing structure and digitally rendered projections of what the Building would look like from several locations after the antennas were constructed. *Id.* at 71-74, 434-443. When the ZBA expressed dissatisfaction with the photographs at the March 17, 2009 hearing and instructed Ms. Stipo to take additional photographs, *id.* at 79-81, she produced two (2) additional photographs with digital projections, and several photographs depicting the surrounding area. *Id.* at 156-64, 540-56.

Although members of the public testified to the negative aesthetic impact of the new antennas, one witness testified that she did not know the cell phone towers were on the roof, and opposed them for "safety" reasons. *Id.* at 198. One witness opposed the towers "visually" and

inquired why "they would pick a residential area rather than one of the cell towers that's already existing with multiple cell companies on them." *Id.* at 207. The President of the Red Ground Civic Association opposed permitting "another cell phone company" from building antennas, on the basis that Metro's proposed antennas and the antennas of a concurrent application would add "at least sixteen new and additional objects on the roof" which "will not be a pretty picture." *Id.* at 215. Other witnesses expressed concern about the "wall effect" of aesthetics, *Id.* at 268, and called the antennas "ugly." *Id.* at 287. Several of these witnesses also testified to their concern about their safety with respect to the radio emissions. Additionally, petitions were submitted opposing the application that indicate that they oppose new and existing antennas on the Building, *id.* at 1031 *et. seq.,* and that some of the tenants "were not aware that such equipment had been previously installed already atop this building." *Id.* at 1043 *et. seq.*

The Village expert, Mr. Comi, testified that there were two (2) possible ways that Metro could address the aesthetic impact of the antennas. First, Mr. Comi suggested Metro could use "stealth" technology to render the antenna "essentially invisible." *Id.* at 240. In rebuttal, Metro presented a licensed architect who prepared a report and testified that stealth technology, "RF transparent screening," was where the company places opaque panels in front of the antenna. *Id.* at 335-38. The architect concluded that the screens were not feasible because the wind would press against the panels in such a way that the roof of the Building would have to be "ripp[ed] off . . . to replace structural members and [would require] tearing down an entire floor" to support the screens. *Id.* at 336-37. Furthermore, if the panels were perforated to allow the wind to pass through, "the antennas themselves would essentially be visible." *Id.* at 338. Mr. Comi responded he had never seen a situation where the building could not withstand the load of the screening

14

materia, and therefore "to simply make a statement that they can't screen this . . . doesn't seem reasonable." *Id.* at 324.

Second Mr. Comi testified that Metro could install DAS antennas which would require a greater number of "much smaller, less obtrusive antenna." *Id.* at 240. In response, Metro made the representation that installation of a DAS system would be more intrusive because it would require "up to seven (7) nodes to duplicate the coverage gained from this single macro site. Each node would consist of antennas and equipment, with some installed in front of residential homes on existing utility poles or upon new poles that would need to be placed." *Id.* at 610-11. Mr. Comi disagreed with the statement, and challenged Metro's conclusion, but provided no proof in support of his argument. *Id.* at 322-23.

Finally, the ZBA challenged Ms. Stipo's conclusion that the three additional pole mounts would be de minimus by asking "at what point does it no longer constitute deminimus." *Id.* at 82. Ms. Stipo testified that twelve to fifteen (12-15) would be a "point of no return." *Id.* at 83. However, it was not clear whether she meant twelve total pole mounts, or twelve additional pole mounts. *Id.*

As there are existing antennas on the roof of the building, an evaluation of whether there was substantial evidence to support the finding of a negative aesthetic impact should consider Metro's claim that it was unreasonably discriminated against in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I). Reasonable discrimination was considered when the TCA was enacted, insofar as municipalities would retain "flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." Willoth, 176 F.3d

at 639 (citing H.R. Conf. No. 104-458, at 208, reprinted in 1996 U.S.C.C.A.N. at 222).

Previously, the ZBA has approved variances permitting Verizon and Sprint, competing wireless communications companies, to build a total of nine (9) pipe mounts on the roof of the Building. In 2001, the ZBA approved a similar application by Nextel to construct an additional twelve (12) pipe mounts with antennas on the roof of the Building, although these pipe mounts were never constructed. *See* Record at 3-5, 83-84. The pipe mounts of competing providers are and were aesthetically similar to the antennas proposed by Metro. *See id.* at 386, Diagram. The ZBA explains that the approval was "a different application and a different time," *id.* at 84, and noted that the Nextel application was granted subject to conditions that included:

> [1] the installations will be done in a manner to minimize the visual impact without compromising safety; and
>
> [2] this variance does not run with the land and expires when technological improvements allow for less intrusive installations that will improve the Building's esthetic appearance.

*Id.* at 84.

Aside from a lapse in time between applications of the three (3) wireless communications providers that they approved and Metro, the ZBA has not articulated in what way the Metro's proposed antennas "create different visual, aesthetic, or safety concerns" to the ones they have already approved. See Willoth, 176 F.3d at 639. The ZBA relies on the decision in City of White Plains, where the Second Circuit found that "the Board had discretion to rely (as it did) on aesthetic objections raised by neighbors who know the local terrain and the sightlines of their own homes." City of White Plains, 430 F.3d at 533. In City of White Plains, the planning board denied a variance to build a one hundred fifty (150) foot wireless telephone communications

tower on a golf course. *Id.* at 530. The denial of the application considered community objections which included a "visual impact study [] prepared by a landscape architect," and discounted evidence presented by the applicants expert. *Id.* at 533. However, in City of White Plains, the communications company sought to build a structure where none existed. In the instant mater, the ZBA had already approved three (3) competing carriers to build prior to denying Metro's application. Therefore, considerations were limited to how the proposed antennas would "create different visual, aesthetic, or safety concerns" to the ones they have already approved. See Willoth, 176 F.3d at 639, cf. Nextel Partners, Inc. v. Town of Amherst, NY, 251 F.Supp.2d 1187, 1193-95 (W.D.N.Y. 2003); compare with SiteTech Grp. Ltd. v. Bd. of Zoning Appeals of Town of Brookhaven,140 F.Supp.2d 255, 261-62 (E.D.N.Y. 2001) (denial of providers application to construct a monopole on aesthetic grounds was supported by substantial evidence when based upon testimony of residents and "members of civic, historical, and senior citizen organizations, sufficiently knowledgeable" about the community's "historic heritage and nature," "prevailing architecture," and "appearance of the immediate and surrounding area.").

The Decision's conclusion that Metro's application to install three (3) pipe mounts has a negative aesthetic impact different from previously approved applications is not supported by substantial evidence.


B.     Impact on Property Values


The ZBA also rejected the application on the basis that "it seems obvious that having an unsightly commercial building, the largest in the Village, will have a negative impact upon the

marketability and the prices of such homes." Decision ¶ 32. Metro submitted an appraisal report prepared by Jed Nelson, a real estate appraiser and broker licensed by the state of New York and approved by the Unified Court System. Record at 480-91. The report detailed a study of the specifications of the proposed equipment and the Building's location within a wooded residential community and concluded that "a co-location on an existing Building will not adversely affect the community or property values." *Id.* at 485. The report describes a study of the home values before and after the existing wireless antennas were constructed on the roof of the Building, concluding that "there is no noticeable difference in the market rate of appreciation for homes located within a three (3) block perimeter of the wireless telecommunication facilities located at 70 Glen Cove Road . . ." *Id.* at 486. The report further studies eight (8) additional communities on Long Island, New York, where different models of wireless communications facilities were constructed finding "no correlation between the presence of wireless telecommunication antennas and declining property values in the Long Island residential communities [] studied." *Id.* at 491. Based upon all of the above studies, Mr. Nelson concluded that construction of the proposed antennas "will not have an adverse impact or negative effect on the subject property, the surrounding and abutting property values or marketability, and will not adversely affect the character of the district or the community." *Id.* Mr. Nelson was available to testify but did not, "because no questions were asked regarding real estate values." *Id.* at 38; Decl. at ¶ 46(d).

In opposition to the application, a resident real estate broker testified the proposed antennas will "effect [sic] the real estate values of this village" because when prospective buyers see "transformers, power lines, or cell towers, there is such a negative reaction," that having

18

antennas "in their back yard" which could "possibly in the future, be deemed detrimental for their health and welfare, is a major reason not to buy in this community," Record at 279-80, and submitted a petition "signed by a principal, two managers, three VIP associates, and the rest of the brokers and sales associates that [she] could find" that agree with her testimony. *Id.* at 278, 1056-58. Several other witnesses gave anecdotal evidence of the inability to sell a house because of the antennas; others questioned the potential health effects of the radio emissions. *See id.* at 212, 286-87.

Although the ZBA is "not bound to accept [Metro's] expert testimony simply because . . . it was insufficiently contested by properly credentialed expert testimony," City of White Plains, 430 F.3d at 533, "[a] few generalized concerns about a potential decrease in property values, especially in light of [] contradictory expert testimony, does not seem 'adequate to support a conclusion' that the permits should be denied." Town of Oyster Bay, 176 F.3d at 496 (citing Universal Camera v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)); see also T-Mobile Northeast LLC v. Town of Ramapo, 701 F.Supp.2d 446 (S.D.N.Y. 2009); Omnipoint Commc'ns, Inc. v. Village of Tarrytown Planning Bd., 302 F.Supp.2d 205, 222 (S.D.N.Y. 2004). The ZBA argues that the Decision relies upon more evidence than the denials in Town of Oyster Bay and Town of Ramapo, because of the testimony and petitions submitted by the real estate brokers. However, taking the entire record into consideration, including the specificity of Mr. Nelson's studies with respect to the lack of effect of existing wireless antennas on local property values, a determination that it is "obvious" that the additional three (3) pole mounts will have a detrimental effect on property values is not supported by substantial evidence.

C.    Need for Coverage

The ZBA found no need for coverage because "a gap in MetroPCS service has not been
proven and, even if one may exist, other service providers have installations on the Building" and
that "MetroPCS's hearing evidence was not clear" and was "contradictory based upon whether
MetroPCS's hearing consultants or marketing . . . representations are credited." Decision ¶ 30.

1.    Whether Metro Established A Significant Gap With Respect to Metro's
       Wireless Services

In support of the claim that a significant coverage gap exists, Metro elicited testimony
from two engineers, John Klostos (Record at 173-90) and Nicholas Balzano (*id.* at 341-53, 365-
367) and affidavits and reports from engineers Fahd Kananeh (*id.* at 450-61), John Klostos (*id.* at
560-71), and Nicholas Balzano (*id.* at 613-42). In his report, Mr. Balzano defined a coverage gap
as "the inability to adequately transmit or receive calls, maintain a call and access the national
telecommunication network for personal, business, 911 emergencies and public safety
communication." *Id.* at 628. Mr. Balzano submitted several maps he prepared purporting to
illustrate the coverage gap. *Id.* at 638-42. The first map depicted an area around the Village
where there was not "reliable in building coverage" from existing and proposed sites. *Id.* at 638.
Two maps illustrated where the proposed installation would provide "reliable in building
coverage" depicting the coverage of the proposed antennas with and without existing coverage.
*Id.* at 639-40. The final maps illustrate the results of a "CW Drive Test" demonstrating where

the proposed site will provide "reliable in building coverage" and of a "Drive Test" depicting where there is currently "reliable in building coverage." *Id.* at 641-42. These tests were performed "as a company" by "[Mr. Balzano] and two more . . . technicians." *Id.* at 350. Based upon these tests, Mr. Balzano concluded that "there is a gap in MetroPCS coverage within the Village of East Hills" *Id.* at 636. This gap was described as a "significant gap." *Id.* at 345.

Mr. Balzano was also questioned about the apparent inconsistency between the maps above demonstrating a gap and "the advertising website promotion for Metro PCS with regard to coverage and application." *Id.* at 364. The ZBA expressed concern that a coverage map on Metro's website showed they had "good quality service" in the area, although this coverage map was never entered into the record. *Id.* at 237. Mr. Balzano explained that the maps he submitted showed a gap in "reliable in building coverage," whereas the map on the website "depicts . . . the ability of a customer to make or receive a call on the street level . . . outside any building." *Id.* at 366.

In opposition, Richard Comi testified that he had reviewed all of the transcripts and the application, and concluded that "there are a significant number of inconsistencies, inaccuracies and lack of information relevant to the proof of need in the report." *Id.* at 234, 235. Prior to rebuttal testimony, Mr. Comi challenged Metro's demonstration of need claiming:

(1) "the propagation map actually has a wrong scale on it (*id.* at 235);

(2) Metro does "not anywhere in the document specify what they mean by reliable coverage" (*id.* at 235-36);

(3) "there are at least three different descriptions of how far this proposed site will go" (*id.* at 236);

(4) the propagation maps "do not give any of the technical information necessary to conclude whether there is a gap in service and, if there is, how large that gap in service is (*id.* at 236); and

(5) the website and propagation maps are "clearly in conflict with each other" (*id.* at 238). Later, after reading Mr. Balzano's report, Mr. Comi testified that Mr. Balzano does not call it a "significant gap" (*id.* at 325, 326), and with two (2) other proposed towers nearby "it's hard for me to understand why they need a third site for coverage in the middle." *Id.* at 326. Mr. Comi admitted that "their maps do show [a significant gap]," however, "if you go to their website, it doesn't show it." *Id.* Mr. Comi suggested that "if we truly wanted to verify what they needed, you could do real-world testing . . . That's not in here." *Id.* at 329.

Mr. Comi conceded that he was not licensed as an engineer or architect, and was not a certified planner or appraiser. *Id.* at 306. He testified that he was known as a "specialist in overall wireless siting" based upon his experience in the telecommunications industry, which includes " buil[ding] a cellular company in the late - early nineties" and having founded a firm "known as The Center of Municipal Solutions." *Id.* at 233, 306. He further testified that he did not perform or participate in a "drive test" with respect to Metro's application, but had been present at two during his career. *Id.* at 311-12. Although he testified that he "could very easily determine very quickly whether or not there is service in [the] surrounding area" (*id.* at 237-38), Mr. Comi did not "utilize personally any expert testing equipment to measure [Metro's] signal strength in the area." *Id.* at 315. Mr. Comi testified he did not have a MetroPCS phone. *Id.* at 237.

The ZBA's finding that a gap was not proven because Metro's evidence was

contradictory is not supported by substantial evidence. Each of the reports and witnesses Metro presented to the board testified to the existence of a clearly defined, tested, significant gap in service. The only evidence in the record that contradicts the claim is Mr. Comi's testimony. However, a number of deficiencies found by Mr. Comi are addressed in the report and testimony. Mr. Comi's claim that the website depicts a coverage map of reliable service in the area is not supported by any evidence in the record. Insofar as Mr. Comi disagrees with Metro's determination of a coverage gap, his opinion is not based upon any objective evaluations or studies that he described in the record. The failure of Metro to introduce its customers' testimony of poor Metro coverage in the area, in and of itself, is not fatal to the application given the evidence of a gap that Metro provided. See New York SMSA Ltd. P'ship v. Town of Oyster Bay Zoning Bd. of Appeals, No. 08-CV-4833, 2010 WL 3937277 at *11-15, (E.D.N.Y. September 30, 2010). Although the board is not compelled to rely exclusively on expert testimony, a finding which relies on Mr. Comi's unsupported opinion to the exclusion of all other witnesses is not based upon substantial evidence. See, e.g., Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 48-50 (1st Cir. 2009) (citing Omnipoint Holdings, Inc. v. City of Cranston, No. 06-531, slip op. at 8, (D.R.I. Oct. 23, 2008)).

2.      Whether Metro Established A Significant Gap With Respect to All Wireless Services At The Building.

In the Second Circuit, "whether the necessity [of a proposed construction] can be demonstrated if other providers are meeting the need for cellular coverage, [is] a point that seems

to be unsettled." City of White Plains, 430 F.3d at 535. Although City of White Plains did not decide this point, it noted the tension between the New York Court of Appeals, which determines a gap in service from the perspective of the provider, and the Willoth, which, in dicta, appears to determine a gap from the prospective of the wireless telephone user. *Id.* at 430 F.3d at 535 n. 3 (citing Cellular Telephone Co., 82 N.Y.2d at 373-74; Willoth,176 F.3d at 643).

Given the goal of the TCA to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies," Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56, a gap in service under the TCA must be evaluated from the perspective of the provider. See Village of Tarrytown, 302 F.Supp.2d at 216-17; but see Omnipoint Commc'ns, Inc. v. Port Authority of New York and New Jersey, No. 99 Civ. 0060, 1999 WL 494120 at *12 (S.D.N.Y. July 13, 1999). To find otherwise would require the TCA to compel a local zoning board to permit the first applicant to build wireless antennas for a region, but allow the board to deny all subsequent applicants to that region on the ground that the existence of any provider precludes finding a coverage gap. This would inhibit competition among wireless providers and ignore the statutory mandate that local governments may not "unreasonably discriminate among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I).

Therefore, the ZBA's finding that Metro has not established a significant coverage gap on the ground that other wireless providers already have service in that area is not supported by substantial evidence.

3.      Alternative Technologies

Metro disputes the "findings" of the ZBA that stealth technology or DAS technology is less intrusive and could be installed in lieu of the proposed antennas. Memorandum of Law in Support of Motion at 16. The Village argues that the ZBA properly took this information into account. However, the Court cannot find, nor do the parties cite, any stated reliance on alternative technologies in the "Determination" section of the Decision. *See* Decision ¶¶ 29-34. The Decision only mentions alternative technologies in the "Findings of Fact" where Mr. Comi's testimony explaining these alternative technologies is noted. *Id.* at ¶ 24. Although the ZBA inquired, and several witnesses testified about the relative feasability of these installations, the decision does not deny the application based upon that the availability of alternative technologies. The extent to which the ZBA would be allowed to rely upon such evidence is unclear in any event. See, e.g., Town of Clarkstown, 612 F.3d 97.

D.      The Relief Requested Was Substantial

The ZBA found that the variance was substantial because "the Building's height is non-conforming and much higher than the height the Zoning Code now permits." Decision ¶ 31. The ZBA does note that "the building's roof now includes several wireless communication panel antennas." *Id.* ¶ 5. Finally, the proposed antennas do not exceed the heights of the existing antenna. Diagram, Record at 386. Notably, the ZBA also granted Nextel's application to construct twelve (12) antennas mounted on twelve (12) pipe mounts on the roof of the Building.

Declaration ¶ 41; Decision ¶¶ 5, 6.

Insofar as denial of the application discriminated against certain wireless communication carriers providing "functionally equivalent services" differently, neither the record nor the decision cites "different visual, aesthetic, or safety concerns" than the existing antennas.  47 U.S.C. § 332(c)(7)(B)(i)(I); Willoth, 176 F.3d at 639.  Objections that the additional antenna are a substantial addition to the existing rooftop antennas, do not address how Metro's application creates different visual, aesthetic, or safety concerns from the Nextel antennas that were approved but never built.  Therefore, insofar as the ZBA denied the application upon the grounds that it seeks a substantial height variance, the determination is not supported by substantial evidence.

E.    Benefit to the Applicant Compared with the Village's Health, Safety and Welfare

The Decision finds "[o]n balance, the perceived and claimed benefit, if any, to the Applicants are outweighed by the detriment posed to the Village community's health, safety and welfare."  Decision ¶ 30.  The ZBA does not claim that it may "regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv).  Metro has provided uncontroverted evidence that the radio frequency emissions of the proposed antennas and the existing antennas comply with the FCC regulations.  Record at 140, 463-79.  Therefore, the ZBA may not rely upon testimony and evidence presented at the hearings concerning the possible health and safety effects of the radio emissions, nor does the Decision

26

suggest any manner in which the antennas affect the health, safety and welfare of the residents of the village.

Nevertheless, repeated inquiries by both the ZBA and residents regarding health and environmental issues justifies the Court's review of the record to determine whether there is substantial evidence to support the ZBA's other findings of fact. See Town of Oyster Bay, 166 F.3d at 495; New York SMSA Ltd. P'ship v. Incorporated Village of Mineola, No. 01-CV-8211, 2003 WL 25787525 at *6 (E.D.N.Y. March 26, 2003). For the foregoing reasons, the denial of Metro's application is not supported by substantial evidence.


F.      Discrimination Between Metro and Other Carriers


As review of a local government's denial of an application to construct wireless facilities requires review of the specific evidence relied upon in the written denial pursuant to the TCA, actions claims alleging violations of 47 U.S.C. § 332(c)(7)(B) are factually specific. It should be noted that the TCA does not require the ZBA to allow an unlimited number of wireless antennas on a structure where they have already approved a single antenna. The ZBA retains "flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." Willoth, 176 F.3d at 639; but see, e.g., Omnipoint Commc'n, Inc. v. Town of LaGrange, 658 F.Supp.2d 539, 561 (S.D.N.Y. 2009) (denial of an application to build antennas on an existing monopole violated the TCA provision against unreasonable discrimination where "the Town Code requires co-location of wireless services."). However,

there is not substantial evidence in the record demonstrating in what way Metro's application creates different visual, aesthetic, or safety concerns from Nextel's application, which was granted, and therefore, the ZBA's denial of this application unreasonably discriminated against Metro.

G.    Article 78 Claim

Insofar as the Court finds that Metro is entitled to relief based on its TCA claim, decision on the Article 78 claim is unnecessary. See, e.g., SMSA v. Oyster Bay Zoning Bd. of Appeals, 2010 WL 3937277 at *4 n. 2.

V.    Remedy

There are no specific remedies within the TCA for a violation of the subsections of 47 U.S.C. 332(c)(7)(B); however, the Second Circuit has held that "the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits." Town of Oyster Bay, 166 F.3d at 497; Willoth, 176 F.3d at 643; see also Town of LaGrange, 658 F.Supp.2d 539, 561-65. Because "further review by defendants would serve no useful purpose and would greatly prejudice [Metro] by further delaying its ability to provide service to the public in a non-covered area," Town of Amherst, 251 F.Supp.2d at 1201; Village of Tarrytown, 302 F.Supp.2d at 226, and that "immediate injunctive relief is the appropriate remedy for Defendants' violation of the TCA", the Village is ordered to grant Metro the requested permit and variances required to locate

the proposed wireless communications facility.

VI.    Conclusion

For the reasons stated above, the motion for summary judgment is granted, and the

Village is ordered to grant Metro the requested permit and variances as articulated above.

The Clerk of the Court is directed to close the case.

**SO ORDERED.**

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: January 20, 2011
        Central Islip, New York